[No. B073231. Second Dist., Div. Seven. Jan. 5, 1994.]

WILFRED D. COLLIN et al., Plaintiffs and Appellants, v.
AMERICAN EMPIRE INSURANCE COMPANY, Defendant and
Appellant.

## COUNSEL

Daniels, Baratta & Fine and Lance Orloff for Plaintiffs and Appellants.

Sonnenschein, Nath & Rosenthal, Michael A. Barnes and Donald W. McCormick for Defendant and Appellant.

## OPINION

## WOODS (Fred), J.—

### I.

### INTRODUCTION AND CONTENTIONS

American Empire Insurance Company (American) appeals from a judgment entered against it in an action on a general liability policy. Plaintiffs Wilfred and Marie Collin (Collins) sued American to collect a $200,000 default judgment against American's insured, a contractor known as Southwest Design. The judgment was for conversion and damage to real property caused by Southwest Design while remodeling the Collins' home.

After a trial on stipulated facts, the Honorable David P. Yaffe of the Los Angeles Superior Court entered judgment against American for $100,000, half the amount requested by the Collins. The trial court held that the damage to the Collins' house was not covered by the American policy because Southwest Design's remodeling of the Collins' house was not an "accident" as required by the policy. The court held that Southwest Design's conversion of the Collins' personal property, however, was an "accident" covered by the policy.

American raises the following contentions on appeal:

1. The judgment was predicated upon "willful" misconduct and not an accident thereby constituting an event not covered by the policy;

2. No evidence was adduced as to how Southwest Design "converted" the Collins' property thereby failing in the necessity to present a prima facie case;

3. The trial court erred when it construed the term "accident" by reference to the insured's intent to harm rather than its intent to perform the act creating liability;

4. The trial court erred in finding that conversion of property constituted "property damage" under the policy definition; and

5. The Collins gave late notice of their claim to American which should have relieved American of any obligation under the judgment.

On their cross-appeal, the Collins make the following contentions:

1. The case presents no evidence of intentional misconduct by Southwest Design pertaining to loss, damage or destroyed personal property of the Collins, therefore American should provide indemnity for the judgment relating to those items; and

2. The trial court erred in determining that their judgment against Southwest Design, based upon consequential damages to their home and fixtures, was not covered by the American policy.

## II.

### STATEMENT OF FACTS

*Procedural Background*

The Collins commenced this action against American on October 9, 1991. The sole cause of action was to satisfy a $200,000 judgment against American's insured, pursuant to Insurance Code section 11580, subdivision (b)(2).[1]

The Collins and American thereafter agreed to try the case on stipulated facts. The trial was held October 9, 1992.

By minute order filed October 13, 1992, the court held that American's policy did not cover the Collins' "real property" damages, but did cover their

---

[1] Insurance Code section 11580, subdivision (b)(2) states: "A provision that whenever judgment is secured against the insured or the executor or administrator of a deceased insured in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment."

"conversion" damages. The court entered judgment against American on November 12, 1992, in the amount of $100,000, the "conversion" portion of the Collins' judgment against Southwest Design. American and the Collins filed timely notices of appeal.

Because this action is an action to satisfy a judgment in a previous lawsuit, it is necessary to review the original dispute and the previous action arising therefrom, as well as the judgment in this case which is the basis of this appeal.

## The Remodeling of the Collins' Home

This action began as a dispute among the plaintiffs, their renter and the renter's remodeling contractor.

The Collins owned a house on Oriole Way in Los Angeles. Beginning on March 3, 1985, they leased their house to Richard Gordon, with an option to purchase. Gordon thereafter hired a company called "Southwest Design" to do some remodeling work on the Collins' house, presumably because he intended to exercise the purchase option.

The remodeling work which Gordon commissioned included the installation of an air conditioner, the removal of a glass wall and a bar, painting over of certain interior surfaces and miscellaneous structural modifications. Notes which appear to belong to Southwest Design mention removal of the bar, painting and etching of the front door, painting of the walls, ceiling and floors, and replacement of light fixtures with newer fixtures. Southwest Design performed this work at Gordon's direction.

## The Collins' Dispute With Gordon

The Collins were unaware of Gordon's remodeling efforts, or at least unaware of their extent. This came to light in the fall of 1985, when the Collins discovered that Gordon had renovated their house without their permission and had taken several personal items from the house.

The Collins' attorney wrote Gordon on September 24, 1985, stating, "you have made major structural changes, including the removal of a ten-foot, beveled glass wall, and the removal of the built-in bar." The Collins' letter also referred to the removal of a chandelier, the painting over of walls and floors, and other tasks which Gordon hired Southwest Design to perform. In his September 24, 1985, letter, the Collins' attorney also pointed out that Gordon had removed numerous personal items belonging to the Collins. The

attorney was particularly concerned about "the removal of almost all of the furniture my clients left in the house when you took possession." The Collins' attorney stated further, "[i]t is my understanding that you have stored all the items removed from the subject premises in a warehouse," and demanded "within one week, a complete inventory of the items stored, and the location of the storage facility." The Collins' attorney added: "My clients also require that all items in storage be fully insured, with proof of this coverage provided on or before October 15, 1985." Finally, the Collins' attorney stated that, if Gordon did not exercise his option to purchase the house, "my clients will want the premises restored *exactly* the way it was when you took possession." (Original italics.)

Gordon did not return the items, purchase insurance for them, or restore the premises to their previous condition. Instead, his business faltered and he was unable to meet his financial obligations. Gordon not only stopped paying rent on the Collins' home, but he stopped paying Southwest Design as well. As a result of Gordon's failure to pay rent, the Collins commenced an unlawful detainer action against him.

With Gordon's permission, the Collins went in November of 1985 to the warehouse where Gordon had stored their personal property under his own name. When they arrived, however, the property stored there had either been removed or destroyed.

Upon retaking possession of their home, the Collins hired the Greenspan Company, an independent insurance adjuster, to estimate the value of the personal property which Gordon had taken from the house, as well as the cost of restoring the premises to their previous condition. The adjuster's report divides the loss between missing property and structural repairs. The magnitude of the loss in these two categories was $55,763.30 and $21,322, respectively, in 1979-1980 values, or a total of $77,085.30. The report also lists values in 1986 dollars: $92,543 in missing personal property and $32,833 in structural loss, for a total of $125,376. The record is silent as to how the property was converted, because, as stipulated, the Collins "do not know what happened to their property."

*The Previous Litigation*

After Gordon stopped paying Southwest Design for the work on the Collins' house, Southwest Design filed an action against Gordon and the Collins to recover the value of the work it had performed. Southwest Design alleged in that action that it had performed $40,000 worth of services on the Collins' home and sought payment in that amount.

In response, the Collins filed a cross-complaint against Southwest Design. Only two causes of action in the cross-complaint were alleged against Southwest Design: the third, entitled "Damages To Real Property," and the fourth, entitled "Conversion."

The third count alleged that Southwest Design's construction work "was commenced without the knowledge, consent, or agreement of cross-complainants," that Southwest Design "damaged the subject property as set out more fully in paragraph 12(c) of the herein cross-complaint," and that "[s]aid construction work was not performed in a proper, workmanlike manner, further damaging said property, and has thereby reduced the value of cross-complainants' property."

Paragraph 12(c), mentioned in the third count, sought damages for "major structural changes, including the removal of a ten-foot bevel glass wall; the removal of a built-in bar; the removal of hanging fixtures, including but not limited to chandeliers; the removal of several works of art; the painting over of custom wallpaper, cabinets and wooden floors; the removal of windows and wall coverings; the removal of all outdoor furniture; the removal of furniture and personal possessions belonging to cross-complainants and the changing of all locks on the subject premises." The Collins alleged that Southwest Design knew the work was unauthorized and, despite this knowledge, damaged the house willfully and maliciously.

The fourth cause of action alleged that the Collins "were, and still are, . . . entitled to possession of certain personal property, including, but not limited to, furniture, artwork and fixtures, which were located at 9100 Oriole Way," and that "[d]uring or about the month of July 1985, cross-defendants herein took and/or destroyed the above-mentioned property, thus depriving cross-complainants of possession thereto and, thereby, converted the same to their own use." Like the third count, the fourth alleged that Southwest Design's conversion of personal property was willful. In short, as the Collins described it elsewhere, "the house suffered from extensive damage due to unfinished remodeling and . . . numerous items of the household furnishings had been removed."

*The Judgment in the Previous Action*

Instead of tendering the Collins' cross-complaint to American, Southwest Design chose to defend itself in the litigation.

Initially, the Collins won a summary judgment on Southwest Design's complaint, leaving only their own cross-complaint at issue. After this development, Southwest Design's attorney withdrew, leaving Southwest Design to defend itself in propria persona.

On November 2, 1988, the Collins moved to strike Southwest Design's answer to the cross-complaint because Southwest Design had willfully refused to respond to discovery. The superior court granted the motion. The November 2, 1988, minute order provided: "The motion to strike is granted. Cross-defendant [Southwest Design] has demonstrated that it will not comply with this court's orders and accordingly this court is left with no alternative but to strike the answer to the cross-complaint and to enter a default judgment on the cross-complaint as against the cross-defendant, Southwest Design."

The following day, the Collins—not Southwest Design—tendered Southwest Design's defense to American. American received the Collins' notification letter on November 10, 1988, over two years after the cross-complaint was filed and over a week after Southwest Design's default.

On November 18, 1988, American retained Murchison & Cumming to defend Southwest Design. This defense was provided under a reservation of rights. After attempting without success to locate the insured, a motion to set aside the default was filed. The court denied the motion, finding that there "has been a failure to show excusable neglect by the moving party."

The court then conducted a prove-up hearing on May 8, 1990, to establish the amount of the Collins' damages. The only witness at the hearing was Mr. Collin. Mr. Collin did not identify the damage to his house or the converted property. Nor did he place a value on a single item of damaged property. Instead, his attorney simply asked him whether he had been damaged "in excess of $230,000," to which he responded "yes." Based upon this "evidence," the court entered judgment in the amount of $100,000 on each of the Collins' two causes of action. There is nothing in the record explaining how this allocation was reached.

*This Action and the Ruling Below*

After their judgment against Southwest Design was final, the Collins commenced this action against American to satisfy the judgment. Their sole cause of action was under Insurance Code section 11580, subdivision (b)(2), which provides that ". . . an action may be brought against the insurer on the policy and subject to its terms and limitations, by [a] judgment creditor to recover on the judgment."

The parties stipulated to 38 facts and to the authenticity of 30 exhibits. Each party filed an opening trial brief, a responsive brief and a reply brief. American argued that it had no duty to pay the Collins' judgment because

(1) the Collins' damages did not result from an "accident"; (2) the Collins' damages failed to constitute "property damage"; (3) the policy contained three exclusions applicable to the Collins' claims; and (4) American was prejudiced by Southwest Design's failure to give notice of the action prior to the default.

After oral argument on October 9, 1992, the trial court issued a minute order on October 13, 1992. In that order, the court reached different conclusions as to the two types of damages which the Collins suffered. Concerning the claim for "damages to property damage," the court ruled that there was no coverage under the American policy because the judgment was based upon deliberate conduct, not an "accident." The court ruled as follows:

"The gravamen of the underlying complaint against the insured is that alterations were made in the house and property was removed from the house without the consent of the owner. The threshold issue, therefore, is whether the insured knew that the person with whom it contracted was not the owner of the house and that the owner had not consented to the work or removal of the property. The only information that the Court has with respect to the issue is the underlying cross-complaint by Collin against the insured, in paragraph 24 of which Collin alleges that: '. . . SW Design knew that said construction work was commenced and would be conducted without the knowledge, consent or agreement of the owners . . . and commenced said work, despite said knowledge . . . .'

"This allegation, the substance of which is repeated in Paragraph 5 of the complaint in this action, is fatal to Collin's claim against AESL for the work performed on the house without his consent. The default by the insured in the underlying action constituted an admission of the material allegations of the complaint for the purposes of that action, and the insured therefore is deemed to have admitted that it deliberately, intentionally and knowingly performed the work without the owner's consent. Such conduct was not insured against in the subject policy and could not have been insured against in any policy."

With respect to the "conversion" portion of the judgment, however, the court held that the judgment was based upon an "accident" and represented a claim for "property damage." The court reasoned as follows: "The claim for the value of property removed from the premises and eventually lost presents different issues. AESL contends that conversion is by its nature an intentional act and therefore liability for it was not and could not be insured against. The stipulated facts however are that Gordon merely stored the furniture in a warehouse; there is no indication that Gordon, let alone the

insured, intended to permanently deprive Collin of the property. Its loss appears to have been accidental and therefore properly the subject of insurance.

"AESL further argues that even if the loss was not intentionally caused it was not within the coverage of the policy because the policy covers only physical injury to, or destruction of, the property, not its loss by theft or disappearance. The policy, however, also covers the loss of use of tangible property which has not been injured or destroyed if such loss of use is caused by an 'occurrence.' As the loss was accidental and not intentional, it was caused by an 'occurrence' as the term is defined in the policy. AESL further argues that the 'loss of use' as that term is used in the policy, means TEMPORARY loss of use only. AESL admits however that the phrase 'loss of use' is not defined in the policy and that when used in the policy it is not modified by the adjective 'temporary.' There is nothing in the policy that indicates that coverage is to be restricted to temporary, as opposed to permanent loss of use."

The court's ruling did not cite any legal authority governing the interpretation of insurance policies or construing the standard provisions of the comprehensive general liability policy. The ruling also did not mention any of the exclusions raised by American, and failed to address American's argument that it was prejudiced by the insured's delay in reporting the claim. Based upon this minute order, the court entered judgment in favor of the Collins in the amount of $100,000, the amount of their judgment against Southwest Design for "conversion" damages.

## III.

### DISCUSSION

The sole question presented by this case is whether the judgment against Southwest Design is covered by American's policy. ■ The interpretation of an insurance policy as applied to undisputed facts is a question of law for the court, and this court is not bound by the trial court's construction. (*Whittaker Corp.* v. *Allianz Underwriters, Inc.* (1992) 11 Cal.App.4th 1236, 1238 [14 Cal.Rptr.2d 659].) Thus, the question on appeal is whether the trial court correctly held that the Collins' fourth cause of action against Southwest Design for "conversion" alleged a covered claim.

A. *General Principles Governing the Interpretation of Insurance Policies Under California Law*

■ An insurance policy is written in two parts: the insuring agreement defines the type of risks which are covered, while the exclusions remove

coverage for certain risks which are initially within the insuring clause. (See e.g., *Occidental Fire & Cas. Co.* v. *Lumbermens Mut. Cas.* (N.D.Cal. 1987) 667 F.Supp. 679, 683.) Therefore, ". . . before even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within the potential ambit of the insurance." (*Hallmark Ins. Co.* v. *Superior Court* (1988) 201 Cal.App.3d 1014, 1017 [247 Cal.Rptr. 638].) This is significant for two reasons. First, ". . . when an occurrence is clearly not included within the coverage afforded by the insuring clause, it need not also be specifically excluded." (*Glavinich* v. *Commonwealth Land Title Ins. Co.* (1984) 163 Cal.App.3d 263, 270 [209 Cal.Rptr. 266].)

Second, although exclusions are construed narrowly and must be proven by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage. *(Whittaker Corp.* v. *Allianz Underwriters, Inc., supra,* 11 Cal.App.4th 1236, 1244; *Dyer* v. *Northbrook Property & Casualty Ins. Co.* (1989) 210 Cal.App.3d 1540, 1547 [259 Cal.Rptr. 298]; *City of Beverly Hills* v. *Chicago Ins. Co.* (C.D.Cal. 1987) 668 F.Supp. 1402, 1406.) ▇ Thus, the plaintiff has the burden of establishing that there has been an "accident" or "occurrence." (*Royal Globe Ins. Co.* v. *Whitaker* (1986) 181 Cal.App.3d 532, 537 [226 Cal.Rptr. 435]; *Hartford Fire Ins. Co.* v. *Karavan Enterprises, Inc.* (N.D.Cal. 1986) 659 F.Supp. 1075, 1077.)

▇ Finally, while an insurer has a duty to defend suits which potentially seek covered damages, it has a duty to indemnify only where a judgment has been entered on a theory which is actually (not potentially) covered by the policy. (*City of Laguna Beach* v. *Mead Reinsurance Corp.* (1990) 226 Cal.App.3d 822, 830 [276 Cal.Rptr. 438]; see also *Hurley Construction Co.* v. *State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 538 [12 Cal.Rptr.2d 629] ["[T]he insured may not speculate about unpled third party claims to manufacture coverage."].) Because American defended Southwest Design, the question is not whether the Collins' action potentially sought damages covered by American's policy, but whether they obtained a judgment within the policy's coverage.

B. *The Trial Court Erred in Finding That the Collins' Judgment for "Conversion" Was Based Upon an "Accident"*

The most critical (but not only) issue before the trial court was whether the Collins' "conversion" damages resulted from an "accident." The court ultimately held that they did.

The court's ruling was erroneous in three respects. First, the Collins' cross-complaint pleaded only intentional conduct, and its allegations must be

deemed true because they form the basis for the ensuing judgment. Because the judgment was based upon purely intentional conduct, the court had no basis to find that it resulted from an "accident."

Second, there was no factual basis—in the cross-complaint or elsewhere—for the court's finding of an "accident." To make out a prima facie case of coverage, the Collins were required to establish that an "accident" took place. They failed to establish how a single one of their possessions was converted and, indeed, stipulated that they did not know what happened to their property. Given this total failure of proof, the court's inference that an "accident" had occurred was clearly improper.

Finally, the court's ruling was based upon a misunderstanding of the term "accident." Under California law, the term refers to the nature of the insured's conduct, not his state of mind. The court improperly held that Southwest Design's deliberate taking of the Collins' property was an "accident" because there was no proof that it "intended to permanently deprive Collin of the property."

1. *Under a Comprehensive General Liability Policy Containing the Standard "Occurrence" Definition, the Controlling Question Is Whether the Insured's Conduct Can Be Characterized as an "Accident"*

■ The basic grant of coverage in the American policy provides as follows:

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

"A. bodily injury or

"B. property damage

"to which this Insurance applies, caused by an occurrence, . . ."

"Occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." This is standard language throughout the insurance industry. (See, e.g., *Dyer v. Northbrook Property & Casualty Ins. Co., supra*, 210 Cal.App.3d 1540, 1546.)

In construing this definition, the California courts have agreed that the controlling issue is whether the claimant was injured as the result of an

"accident." (*Commercial Union Ins. Co.* v. *Superior Court* (1987) 196 Cal.App.3d 1205, 1209 [242 Cal.Rptr. 454].) The remainder of the definition "merely explains that expected or intended injuries or damage are not 'accidents' within the meaning of the policy." (*Ibid.*) In *American Guar. & Liability* v. *Vista Medical Supply* (N.D.Cal. 1988) 699 F.Supp. 787, 790, the court similarly concluded that the standard "occurrence" definition is a broader limitation on coverage than an exclusion for intentionally caused harm. More recently, the Court of Appeal observed in *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846, 860 [13 Cal.Rptr.2d 318] that the term "occurrence" as defined in a comprehensive general liability policy means "accidental."

> 2. *Because the Collins' Judgment for "Conversion" Was Based Upon a Cross-complaint Alleging Intentional Misconduct, the Court Erred in Finding That Their Damages Resulted From an "Accident"*

██ ██ In determining the nature of the conduct upon which a judgment is based, one naturally must look to the allegations in the pleadings. The trial court correctly observed below that a judgment based upon allegations of intentional wrongdoing is not—and cannot be—insured under a liability policy. The court applied the doctrine inconsistently, however. ██ The court properly ruled that the Collins' third cause of action (for "damages to real property") pleaded nonaccidental conduct and therefore was not covered by American's policy. ██ The court's error was in failing to analyze the fourth cause of action (for "conversion") in the same manner, since it contained the same allegations.

██ Where a party defaults, the allegations against it are deemed true. (*Morehouse* v. *Wanzo* (1968) 266 Cal.App.2d 846, 853 [72 Cal.Rptr. 607].) ██ The trial court recognized and properly applied this rule in determining the issue of coverage for the third cause of action. That count alleged willful wrongdoing on Southwest Design's part. The court noted that: "The default by the insured in the underlying action constituted an admission of the material allegations of the complaint for the purposes of that action, and the insured therefore is deemed to have admitted that it deliberately, intentionally and knowingly performed the work without the owner's consent." The court agreed that: "Such conduct was not insured against in the subject policy and could not have been insured against in any policy."

██ Inexplicably, the court failed to apply the same analysis in analyzing coverage for the fourth count. The fourth count alleged that Southwest Design "took and/or destroyed" the Collins' property "and, thereby, converted the same to their own use," and further alleged that these acts "were

willful, malicious, oppressive and done in conscious disregard of [the Collins'] rights . . . ." Southwest Design's default admitted these allegations and the judgment on the fourth count was therefore based upon intentional conduct. It could not have resulted from an "accident."

■ It is fundamental that allegations of intentional wrongdoing do not allege an "accident." (See *Chatton* v. *National Union Fire Ins. Co.*, *supra*, 10 Cal.App.4th 846, 861 ["[I]t is well settled that intentional or fraudulent acts are deemed purposeful rather than accidental and, therefore, are not covered under a CGL policy."]; *Royal Globe Ins. Co.* v. *Whitaker*, *supra*, 181 Cal.App.3d 532, 537 [Judgment for intentional misrepresentation not covered because "[a]n intentional act is not an 'accident' within the plain meaning of the word."]; *Hurley Construction Co.* v. *State Farm Fire & Casualty Co.*, *supra*, 10 Cal.App.4th 533, 539 ["Since the Fireman's Fund complaint was predicated on the allegation that Hurley conspired to engage in fraudulent billing practices, none of the damages asserted arose from an accidental 'occurrence' within the meaning of the insuring clause."]; *Allstate Ins. Co.* v. *Hansten* (N.D.Cal. 1991) 765 F.Supp. 614, 616 [Allegations "that the Hanstens committed intentional violations of their legal obligations . . . can not create liability that would result from an accidental loss."]; *Giddings* v. *Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 220 [169 Cal.Rptr. 278] [Where a "complaint alleges a far-reaching scheme of intentional wrongdoing," it "utterly fails to allege this loss was caused by an 'occurrence.' "].) The fact that the pleader "could have" alleged negligence is irrelevant if the judgment is based upon a noncovered risk. (*City of Laguna Beach* v. *Mead Reinsurance Corp.*, *supra*, 226 Cal.App.3d 822, 830.) ■ The trial court gave no reason for discounting the allegations of intentional wrongdoing which formed the factual predicate for the "conversion" judgment, and its conclusion that the allegations were controlling on the third count but not the fourth was erroneous.

C. *The Collins Did Not Meet Their Burden of Establishing an "Accidental" Conversion, and the Trial Court Improperly Assumed Nonexistent Facts and Put the Burden on American to Disprove Them*

Apart from the purely intentional nature of the Collins' "conversion" allegations, the trial court's finding of an "accident" was erroneous for a second reason: there was not a scintilla of evidence in the record supporting the finding. Indeed, the Collins stipulated that they do not know what happened to their property. The trial court responded by assuming hypothetical facts and placing the burden on American to disprove them.

1. *By Stipulating That They "Do Not Know What Happened to Their Property," the Collins Conceded That They Could Not Establish a Prima Facie Case of Coverage Under the American Policy*

As discussed previously, the party seeking coverage has the burden of proving a loss within the insuring agreement. Because the "occurrence" or "accident" requirement is in the insuring clause, the party seeking coverage must establish an "occurrence" or "accident." (*Chamberlain v. Allstate Ins. Co.* (9th Cir. 1991) 931 F.2d 1361, 1364.

In this case, the Collins failed to establish that the "conversion" of their personal property was the result of an "accident." Indeed, the parties stipulated that "The Collins do not know what happened to their property." Given this stipulation, they could not possibly establish—and the trial court could not reasonably find—that their property was "accidentally" converted.

By coincidence, Division Five of this court recently addressed a remarkably similar situation, reversing a decision of the Los Angeles Superior Court where the party seeking coverage had stipulated that it lacked information necessary to establish a loss within the basic insuring clause. (*Whittaker Corporation v. Allianz Underwriters, Inc., supra,* 11 Cal.App.4th 1236.) In *Whittaker*, the insured sought coverage in connection with property damage claims covering several years. The policies at issue therein were identical to American's. The question in *Whittaker* was whether the insured could establish a loss within the defendants' policy periods. The trial court found in favor of the insured, and the insurers appealed.

The court reversed, finding that the insured had failed to prove—indeed, could not prove—a loss within the policy period. (11 Cal.App.4th at p. 1244.) The critical factor was that the parties had stipulated that the insured did not know when the damage occurred. (*Ibid.*) In light of this stipulation, Division Five held that the insured could not prove a covered loss: "The parties stipulated that it is impossible to determine which particular drum of compound sold to Ball is on any given shell or end, or when an end was lined, or when after being lined to a shell or end, the compound turned brittle. The burden of proof is on Whittaker, the insured, to prove that an event is within the scope of coverage. [Citation.] *In light of the stipulation, Whittaker cannot show that Ball suffered property damage fiscal 1983.*" (*Ibid.,* italics added.)

Here, as in *Whittaker*, the parties seeking coverage have stipulated that they cannot establish a critical element of the insuring clause: that the conversion of the contents of their house was an "accident." Accordingly, their claim necessarily must fail for lack of proof.

### 2. *Without the Benefit of Any Facts Regarding the Disappearance of the Property, the Court Had No Basis From Which to Infer That the Loss Was Accidental*

 The trial court evidently inferred that the conversion of the Collins' property was "accidental." In the absence of evidence showing how the property was converted, however, the trial court could not properly draw such an inference.

As noted, the Collins do not know what happened to their property. To the extent there was any evidence as to what happened to the property, it suggested that Richard Gordon removed the property and stored it in a warehouse. The Collins discovered this in September of 1985 and had their attorney write Gordon to demand return of the property. The Collins did not, however, recover the property. The 38 stipulated facts and 30 exhibits are devoid of any information regarding who actually removed the property, or why, or what they did with it, or why the Collins were unable to recover it.

From these bare facts, the trial court reached the following conclusion: "The stipulated facts however are that Gordon merely stored the furniture in a warehouse; there is no indication that Gordon, let alone the insured, intended to permanently deprive Collin of the property. Its loss appears to have been accidental and therefore properly the subject of insurance."

Judge Yaffe had no factual basis to infer that the loss was "accidental." Evidence Code section 600, subdivision (b) defines an "inference" as "a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." It is fundamental that one cannot make an inference from thin air: "Where there is no evidence or not even slight evidence of an essential fact to be proved by the plaintiff, a conclusion of a trial court or jury based thereon becomes a mere conjecture and does not rise to the dignity of an inference." (*Juchert* v. *California Water Service Co.* (1940) 16 Cal.2d 500, 506 [106 P.2d 886].) The absence of critical evidence does not give rise to an inference that the missing evidence exists; rather, it indicates a failure of proof: "If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary." (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 45 [221 Cal.Rptr. 171].) A judgment cannot be based on guesses or conjectures. (*Ibid.*) Given the total absence of any evidence surrounding the conversion of the Collins' property, the trial court's assumption that the "loss appears to have been accidental" is merely a guess or conjecture which does not rise to the dignity of an inference.

To the extent the trial court perceived that Richard Gordon (not the insured) converted the property, there were still no facts suggesting that the conversion was an "accident." The record is silent as to Southwest Design's involvement in the conversion. It may have had no involvement; it may have ordered Gordon to remove the property; or it may have stolen the property itself. While there may have been no evidence that "the insured[ ] intended to permanently deprive Collin of the property," there was similarly no evidence that it did not. The absence of such evidence should not have led to the inference that the conversion was an "accident," but to the conclusion that the plaintiffs failed to establish a critical element of their case.

### 3. To the Extent the Court Placed the Burden on American to Prove That the Conversion Was Nonaccidental, the Court Committed Error

One way to explain the trial court's finding of an "accident" is that it assumed American had the burden of establishing that the loss resulted from nonaccidental conduct. If so, the court was clearly wrong.

The court's ruling appears to assume that American had the burden of disproving the existence of an "accident." In its minute order, the court noted that "there is no indication that Gordon, let alone the insured, intended to permanently deprive Collin of the property. Its loss appears to have been accidental." The court's questions and statements at oral argument appear to confirm this conclusion:

"The Court: Well, how do I know whether [the painting] was deliberate? . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"Mr. Barnes: I would respond to that in two ways. One, if you don't know, then, the plaintiffs have failed to prove entitlement in accordance—

"The Court: The plaintiff says it's your burden because it's an exclusion.

"Mr. Barnes: It's not an exclusion. It's part of the insuring clause. . . .

"The Court: Well, the question is, at what point does the burden shift?"

Thus, it appears from the trial court's questions and ruling that it believed American had the burden of establishing that the insured's conduct was nonaccidental. Until the Collins made out a prima facie showing of an "accident," however, American had no burden whatsoever. The court's apparent understanding to the contrary was erroneous.

#### 4. The Trial Court Improperly Construed the Term "Accident" to Refer to the Consequences of the Insured's Conduct Rather Than the Nature of the Conduct Itself

The trial court's third error in applying the "occurrence" definition is that it misconstrued the term "accident" to refer to an unintended injury rather than an unintended act. The overwhelming weight of California authority holds that the term "accident" refers to the nature of the act giving rise to liability, not to the insured's intent to cause harm; for this reason, conversion (absent bizarre circumstances) can never be an "accident" because the insured's liability is based upon the deliberate taking of property. By focusing upon the absence of any evidence that the insured "intended to permanently deprive Collin of the property," the court applied the incorrect legal standard.

##### a. Under California law, the term "accident" in an insurance policy refers to an act which the insured does not intend to perform, not to an injury which the insured does not intend to inflict

 California courts interpreting "occurrence" have focused exclusively on the insured's intent to perform the act which gives rise to liability, not on the insured's state of mind. If the claimant's injuries did not result from an "accident," it does not matter whether the insured expected or intended his conduct to cause any harm.

 The California Supreme Court has defined the term "accident" as " ' "an unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause." ' " (*Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553, 559 [91 Cal.Rptr. 153, 476 P.2d 825].) Put differently, it is "something out of the usual course of events . . . which happens suddenly and unexpectedly and without design." (*State Farm Fire & Casualty Co.* v. *Drasin* (1984) 152 Cal.App.3d 864, 867 [199 Cal.Rptr. 749].) This common law construction of the term "accident" becomes part of the policy and precludes any assertion that the term is ambiguous. (*Allstate Ins. Co.* v. *LaPore* (N.D.Cal. 1991) 762 F.Supp. 268, 270.)

 Because the term "accident" refers to the insured's intent to commit the act giving rise to liability, as opposed to his or her intent to cause the consequences of that act, the courts have recognized—virtually without exception—that deliberate conduct is not an "accident" or "occurrence" irrespective of the insured's state of mind. The most comprehensive discussion of the term appeared in *Merced Mutual Ins. Co.* v. *Mendez* (1989) 213 Cal.App.3d 41, 50 [261 Cal.Rptr. 273], in which the court reiterated that

conscious and deliberate actions of an insured are never an "accident," irrespective of whether the insured intends for harm to result from those actions: "We reject appellants' argument that in construing the term 'accident,' chance or foreseeability should be applied to the resulting injury rather than to the acts causing the injury. In terms of fortuity and/or foreseeability, both 'the *means* as well as the result must be unforeseen, involuntary, unexpected and unusual.' . . . An accident, however, is never present when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage. . . . [W]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." (Original italics, citations omitted.)

As stated in *American Guar. & Liability Ins. Co.* v. *Vista Medical Supply* (N.D.Cal. 1988) 699 F.Supp. 787, 790, the cases "focus not on the intent of the insured to cause harm, but upon the nature of the harmful act itself— whether it was an 'accident.'" The same court observed that: "Where the act giving rise to damages was intentional, the California courts have rejected the argument that while the act was intentional, the damages were not." (*Id.,* at p. 791.)

Likewise, in *Commercial Union Ins. Co.* v. *Superior Court, supra,* 196 Cal.App.3d 1205, 1208-1209, the Court of Appeal reversed the trial court's conclusion that coverage may exist even though the act leading to the injury or damage is expected or intended in light of "the plain and ordinary meaning of the word 'accident,'" the trial court "erroneously applied the term 'accident' to the consequences of the act rather than to the happening of the act itself." (See also *Hartford Fire Ins. Co.* v. *Karavan Enterprises, Inc., supra,* 659 F.Supp. 1075, 1077 ["Neither the intentional termination nor any unintended consequences of the termination constitute an 'occurrence.'"]; *Royal Globe Ins. Co.* v. *Whitaker, supra,* 181 Cal.App.3d 532, 537 ["[T]he definition of 'accident' halts any argument claiming the appellants' assignor intended his act but not the resulting harm."]; *Bailey* v. *State Farm Fire Ins. Co.* (N.D.Cal. 1992) 810 F.Supp. 267, 270 [Where insureds performed landscaping on neighbor's land, the acts "cannot be considered accidental merely because they did not intend to harm Flagg and Airriess."]; *Allstate Ins. Co.* v. *Morgan* (N.D.Cal. 1992) 806 F.Supp. 1460, 1465 [It was "irrelevant that the Morgans may not have intended to damage the Tromblers" because "California courts have held that a loss does not become 'accidental' simply because the insured did not intend to cause the injury."]; *Allstate Ins. Co.* v. *Chaney* (N.D.Cal. 1992) 804 F.Supp. 1219, 1221-1222 [Insured's argument that the damages "were unintended, and therefore constitutes an

'accident' " must be rejected because it "ignores the clear weight of authority reaching the opposite conclusion."]; *Chamberlain v. Allstate Ins. Co., supra,* 931 F.2d 1361, 1365 [Insured's failure to convey property to girlfriend "should not be considered accidental merely because he did not intend [her] to be hurt by his intentional acts."].) The only California case failing to recognize this principle is *Allstate Ins. Co. v. Vavasour* (N.D.Cal. 1992) 797 F.Supp. 785; significantly, the author of that opinion promptly issued a new ruling in *Bailey v. State Farm* which reaffirms the principle adopted in every other California decision.

 b. *Because the essence of "conversion" is the exercise of dominion over the property of another, virtually every court to consider the question has agreed that "conversion" cannot occur "accidentally"*

 The tort of conversion is an "act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." (*Oakes v. Suelynn Corp.* (1972) 24 Cal.App.3d 271, 278 [100 Cal.Rptr. 838].) In order to establish a conversion, the plaintiff "must show an intention or purpose to convert the goods and to exercise ownership over them, or to prevent the owner from taking possession of his property." (*Ibid.*) Thus, a necessary element of the tort is an intent to exercise ownership over property which belongs to another. For this reason, conversion is considered an intentional tort. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 624, pp. 717-718.)

 Our research has located no California case addressing whether "conversion" is an "accident" or "occurrence."[2] Nonetheless, two federal courts of appeal, four state supreme courts and two intermediate state courts of appeal have agreed that it is not. These cases are persuasive.

 This issue was addressed in *Simmons Refining Co. v. Royal-Globe Ins. Co.* (7th Cir. 1976) 543 F.2d 1195 (applying Illinois law), in which the insured sought coverage for a conversion claim arising from its purchase of stolen gold. Rejecting the insured's argument that its purchase was an "accident" because it did not know the gold was stolen, the court held that the insured intended to buy the gold and therefore there was no "accident": "[W]hen Simmons purchased the gold it was purposely purchasing a supply of gold it wanted. It directed its mode of delivery and to all intents and purposes it exercised physical dominion over the property. Accordingly, under the

---

[2]The only reported California case to address coverage for conversion appears to be *Karpe v. Great American Indem. Co.* (1961) 190 Cal.App.2d 226 [11 Cal.Rptr. 908]. There, the court held that conversion is a wilful act and therefore coverage is barred by the statutory exclusion set forth in Insurance Code section 533. (190 Cal.App.2d at p. 230.)

policy provisions such physical control by Simmons over the gold would excuse Royal-Globe from any obligation as an insurer of Simmons." (*Id.* at p. 1198.)

*Simmons* was followed in another Seventh Circuit decision, *Red Ball Leasing* v. *Hartford Acc. & Indem. Co.* (7th Cir. 1990) 915 F.2d 306 (applying Indiana law), in which a leasing company repossessed a vehicle on the mistaken belief that the lessee had missed several payments. The lessor was sued for conversion and tendered its defense to Hartford. Interpreting policy language identical to American Empire's, the court held that the conversion claims did not arise from an "accident" or "occurrence" because the insured obviously intended to repossess the vehicle. (*Id.*, at p. 311.) Even if its decision to take the truck was based upon erroneous information, the act of repossession was not "accidental": "A volitional act does not become an accident simply because the insured's negligence prompted the act. Injury that is caused directly by negligence must be distinguished from injury that is caused by a deliberate and contemplated act . . . . [T]he latter injury, because it is intended and the negligence is attenuated from the volitional act, is not an accident." (*Ibid.*)

Numerous other courts have agreed that "conversion" cannot be an "occurrence." In *Federated Mut. Ins. Co.* v. *Madden Oil Co., Inc.* (Mo.Ct.App. 1987) 734 S.W.2d 258, the insured obtained title to a truck trailer and was sued for conversion because a secured lender had a superior interest. The Missouri Court of Appeal held that there was no "occurrence" because the insured intended to assert ownership rights over the trailer, meaning its "conduct was not an accident." (*Id.*, at p. 261.) Likewise, in *General Ins. Co. of America* v. *Palmetto Bank* (1977) 268 S.C. 355 [233 S.E.2d 699], a lessor seized and sold a lessee's property, resulting in a conversion suit. The court held that this was not an "occurrence" because "Home Wholesale intentionally distrained the machines." (*Id.* at p. at 701; see also *Corvallis Sand & G. Co., Inc.* v. *Oregon Auto. Ins. Co.* (1974) 268 Ore. 505 [521 P.2d 1044, 1048] [In an action against the insured for wrongfully entering land and removing gravel, the court held the complaint " 'did not allege an "occurrence or accident" which was covered by the policy.' "]; *Proctor Seed & Feed Co., Inc.* v. *Hartford Acc. & I. Co.* (Ark. 1973) 253 Ark. 1105 [491 S.W.2d 62, 64] [Where the insured entered counterclaimant's property and removed soybeans, "[o]f course, it is at once apparent that the allegations in the counter-claim do not in any manner relate to an 'accident.' "].)

This issue was articulated most clearly by the Texas Supreme Court in *Argonaut Southwest Insurance Company* v. *Maupin* (Tex. 1973) 500 S.W.2d 633, where the insured removed 6,000 cubic yards of soil from a site with

the approval of the occupant. Unfortunately, as in the case at bench, the occupant did not own the site, and the owner sued to recover the value of the soil. The Texas court, foreshadowing the *Red Ball Leasing* decision 17 years later, held that the insured's purposeful conduct was not an "accident" just because it resulted from a misunderstanding of its legal rights: "The plaintiff's act in trespassing upon the Meyers' property did not constitute an accident. They did what they intended to do by removing the borrowed material from the property. The fact that they were unaware of the true owner of the property has no bearing upon whether the trespass was caused by accident. . . . The damage was not an accident or occurrence within the meaning of this policy." (*Id.* at p. 635.)

Finally, a recent case considering the question at hand agreed that conversion by its nature does not result from "accidental" conduct. In *Travelers Ins. Companies* v. *P.C. Quote, Inc.* (1991) 211 Ill.App.3d 719 [156 Ill.Dec. 138, 570 N.E.2d 614, 618], the insured's employee ordered 10 computers and evidently converted them. The insured, sued for the value of the computers stolen by its employee, sought coverage under its general liability policy. The Illinois court, however, held that the purchase of computers is not an "accident" even if it is unauthorized by the insured: "P.C. Quote fails to argue in what way the ordering of computers by its own employee can fall into the most broad and commonly used definition of accident. An accident occurs when something unexpected, unintended and unusual happens. [Citation.] Whether expected or not, we believe that the ordering of computers and the subsequent failure to pay for the computers cannot be considered an 'accident.' " (*Id.*, at p. 619.)

Thus, those courts to consider the question have overwhelmingly agreed that "conversion" is not "accidental" conduct because it is based on inherently deliberate conduct. Judge Yaffe's opinion did not distinguish or cite any of the aforementioned authorities. Nonetheless, it is clear that the vast majority of cases throughout the country hold that conversion is not an "occurrence" or "accident." The California Supreme Court has indicated several times in recent years that it is appropriate to look to the decisional law of other states where insurance matters are concerned. (See, e.g., *J. C. Penney Casualty Ins. Co.* v. *M. K.* (1991) 52 Cal.3d 1009, 1027 [278 Cal.Rptr. 64, 804 P.2d 689] [Vast majority of other states find child molestation to be inherently harmful and thus uninsurable.]; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 818-821 [274 Cal.Rptr. 820, 799 P.2d 1253] [Vast majority of other states find that environmental cleanup costs are "damages" within the meaning of the standard comprehensive general liability policy.]; *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 297-298 [250 Cal.Rptr. 116, 758 P.2d 58] [Most states do not

allow direct "bad faith" action against insurer by injured party.].) Thus, if confronted with the issue, it appears that the California Supreme Court would give consideration to the clear weight of authority in other jurisdictions.

 c. *The insured's hypothetical intent to return the property (of which there is no evidence) would not render its conversion of the property "accidental"; it would only negate a subjective intent to injure the Collins*

As noted above, the trial court ruled in its minute order that the loss of the Collins' property "appears to have been accidental" because "there is no indication that Gordon, let alone the insured, intended to permanently deprive Collin of the property." It is clear from the oral argument that the court was under the impression—which had no basis in the record—that the insured intended to return the Collins' property after the remodeling was completed:

"THE COURT: Well, conversion is an intentional tort in that it requires the intentional act of taking possession of the goods of somebody else, but it does not require, as I understand it, the intention to permanently deprive the other person of the goods. It does not require the intention not to return the goods. It does not require the intention to appropriate or permanently deprive the owner of the goods.

"If we have a situation in which the insured took—intentionally took the items out of the house and put them into storage, intending fully to have them returned at a later time, and then they got lost or disappeared; do we have some—do we have conduct that is not covered by the policy?

" . . . . . . . . . . . . . . . . . . . .

". . . Let's take the insured's version of the facts for a moment. [¶] The insured here intended to take this property out of the house and put it in storage. That's all he intended to do. He did not intend to lose it, steal it, have it disappear. All of that was not intended by the insured.

" . . . . . . . . . . . . . . . . . . .

"In which of those [out-of-state conversion] cases did the insured intend to take possession of the property but also intend to return it, and then have it for unintended reasons not be available to return?"

Thus, the court's ruling evidently was based upon its perception that the insured removed the Collins' property[3] with the intent of returning it.

The insured's intent, however, is irrelevant in determining whether its deliberate conduct was an "accident." As stated in *Merced Mutual Ins. Co.* v. *Mendez, supra,* 213 Cal.App.3d 41, 50, ". . . where the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury." Judge Yaffe's analysis runs directly contradictory to a long line of California cases holding that the insured's motive for performing an act has nothing to do with whether the act itself is an "accident." (See also *Allstate Ins. Co.* v. *LaPore, supra,* 762 F.Supp. 268, 271 [Because defamation "requires proof that the defendant intended to publish the defamatory statement, . . . [t]he very nature of defamation precludes the conclusion that it can occur 'accidentally.' "]; *Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d 553, 560 ["The deliberate nature of Kaufman's act . . . prevented the overcutting from constituting an accident."]; *Chamberlain* v. *Allstate Ins. Co., supra,* 931 F.2d 1361, 1365.].)[4]

D. *The Trial Court Erred in Holding That Conversion of Property Is "Property Damage"*

The American policy only covers "property damage," as that term is defined therein. Virtually every court to consider the question has agreed that "conversion" of property is not "property damage." Notwithstanding these rulings, the trial court ruled that "conversion" fell within the definition of "property damage" because the definition includes "loss of use" of property. "Loss of use" of property is not the same as "loss" of property.

---

[3]The court recognized that Southwest Design was deemed to have taken the property, since there was a judgment to that effect:

"THE COURT: Well, if I'm going to accept the underlying judgment against Southwest, don't I have to infer that Southwest did the converting?

"MR. BARNES: Sure, that's what the judgment is for. That's straight out of City of Laguna Beach versus Mead [(1990) 226 Cal.App.3d 822 (276 Cal.Rptr. 438)].

"THE COURT: So I can't accept conversion of the facts to the effect that Gordon took everything and Southwest didn't have anything to do with it because that would not explain the judgment against Southwest, would it?"

[4]The trial court's analysis was rejected in an analogous fact situation in *City of Beverly Hills* v. *Chicago Ins. Co., supra,* 668 F.Supp. 1402. There, the court held that the insured's denial of an administrative hearing to a towing "victim" was clearly intentional and the fact that the denial resulted from the city clerk's negligence in allowing the hearing policy to lapse did not change the nature of the act. (*Id.,* at p. 1406.) Here, Southwest Design clearly intended to convert the Collins' property: whether it "negligently" failed to return it (as the trial court seemed to believe) is irrelevant.

### 1. Cases in Other Jurisdictions Have Agreed That "Conversion" of Property Is Not "Property Damage"

 The American policy defines "property damage" as "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." This definition does not include conversion.

Although no California court has specifically addressed whether "conversion" is property damage, virtually every other court to consider the question has held that it is not. (See *Nortex Oil & Gas. Corp.* v. *Harbor Insurance Co.* (Tex.Civ.App. 1970) 456 S.W.2d 489, 493 ["There is a material difference between 'property taken' and 'property damaged.' "]; *Travelers Ins. Companies* v. *P.C. Quote, Inc., supra,* 570 N.E.2d 614, 618 ["There is a difference between damage to property and loss of property."]; *General Ins. Co. of America* v. *Palmetto Bank, supra,* 233 S.E.2d 699, 701 ["The only damage here alleged was, of course, the wrongful deprivation of property, not physical injury to the property."]; *B & L Furniture Co.* v. *Transamerica Ins. Co.* (1971) 257 Ore. 548 [480 P.2d 711, 713]; *Corvallis Sand & G. Co., Inc.* v. *Oregon Auto. Ins. Co., supra,* 521 P.2d 1044, 1048; *Inland Const. Corp.* v. *Continental Cas. Co.* (Minn. 1977) 258 N.W.2d 881, 884 [A.L.R.4th 4043].) Thus, three state supreme courts and two other courts of appeal have held that "conversion" is not "property damage." Rather, noted these courts, "conversion" is the *taking* or *deprivation* of property.

### 2. The Trial Court Improperly Held That "Loss Of Use" of Property Is the Same as "Loss" of Property

 Despite the overwhelming weight of cases from other states holding that "conversion" is not "property damage," the trial court found that "conversion" constitutes "loss of use" of property, and thus falls within the second prong of the "property damage" definition.[5] The court ruled as follows: "The policy . . . covers the loss of use of tangible property which has not been injured or destroyed if such loss of use is caused by an 'occurrence.' As the loss was accidental and not intentional, it was caused by an 'occurrence' as the term is defined in the policy. AESL further argues that the 'loss of use' as that term is used in the policy, means TEMPORARY loss of use only. AESL admits however that the phrase 'loss of use' is not defined

---

[5]The second clause of the definition includes "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

in the policy and that when used in the policy it is not modified by the adjective 'temporary.' There is nothing in the policy that indicates that coverage is to be restricted to temporary, as opposed to permanent loss of use."

The Collins did not brief the "loss of use" argument and only mentioned it in passing in oral argument. The trial court cited no legal authority supporting its conclusion that the "loss of use" language was meant to cover "conversion."

Contrary to the trial court's impression, American never argued that the policy only covered temporary loss of use as opposed to permanent loss of use. American argued instead that (1) "loss of use" refers to the rental or income value of property which has been damaged or rendered unusable; and (2) the Collins did not seek damages for "loss of use" of their property but for the value of the property itself.

"Loss of use" of property is different from "loss" of property. To take a simple example, assume that an automobile is stolen from its owner. The value of the "loss of use" of the car is the rental value of a substitute vehicle; the value of the "loss" of the car is its replacement cost. The nature of "loss of use" damages is described in California Jurisprudence Third as: "The measure of damages for the loss of use of personal property may be determined with reference to the *rental value* of similar property which the plaintiff can hire for use *during the period when he is deprived of the use* of his own property." (23 Cal.Jur.3d, Damages, § 69, pp. 129-130, italics added.)

 In *AIU Ins. Co.* v. *Superior Court, supra*, 51 Cal.3d 807, 827-828, the California Supreme Court unanimously reaffirmed the fundamental rule that one cannot read a policy term in such a way that would render some of its words meaningless. There, the court examined the phrase " 'legally obligated to pay *as damages*,' " and concluded that the phrase "as damages" must have a limiting effect, otherwise, the drafters would not have included the additional language in the policy. (*Ibid.*) This rule is a specific application of Civil Code section 1641, which provides that: "The whole of a contract is to be taken together, so as to give effect to *every part*, if reasonably practicable, each clause helping to interpret the other." (Italics added.) Under *AIU*'s holding, the trial court should not have ignored the limiting words "*loss of use.*"

The court's error is understandable: the Collins did "lose the use" of their property. What the court failed to appreciate is that the damages they

recovered were not "loss of use" damages but the value of the property itself. Had American wished to insure "loss of property," its policy would have so provided.

E. *The Trial Court Erred in Failing to Conclude That American Suffered Actual Prejudice as a Result of Southwest Design's Failure to Give Notice of the Collin Claim*

 Like virtually all liability policies, the American policy required Southwest Design to give notice of any covered occurrence "as soon as practicable" and required that if a "suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative." Under California law, an insured's breach of these conditions will relieve the insurer of liability if it is actually prejudiced by the late notice. (*Northwestern Title Security Co.* v. *Flack* (1970) 6 Cal.App.3d 134, 142-143 [85 Cal.Rptr. 693].)

 There is no question that Southwest Design failed to give prompt notice of the suit to American. Indeed, Southwest Design never gave notice of the suit. The Collins' cross-complaint was filed July 23, 1986, and American first received notice of the action on November 10, 1988—over two years later and eight days after the insured's default was taken.

Two years does not readily fall within one's concept of "prompt." The question is whether American was "actually prejudiced" by this delay.

The first way in which American was actually prejudiced by the late notice is that the judgment entered against its insured was substantially higher than the Collins' actual damages. The only information in the record regarding the actual value of the property converted from the Collins is the Greenspan report, which accounted for $55,763.30 in "missing" property in 1979 prices. Yet, a judgment was entered on the conversion count for $100,000. Had American been able to propound discovery in the case, it is reasonable to assume that American could have established that the Collins' conversion damages were only $55,763.30 as reflected in the Greenspan report. Because the insured was in default when the case was tendered, however, the counsel appointed by American could do nothing at the "prove up" hearing except object to the lack of foundation for the $100,000 damage claim.

More fundamentally, however, American was prejudiced because a $100,000 judgment was entered for "conversion" and the Collins now

concede that they have no proof that Southwest Design actually converted anything. A concession by the judgment-holder that it had no evidence of liability must surely constitute prejudice.

This point is illustrated vividly by the transcript of the "prove up" hearing, in which the defense counsel retained by American tried to establish that Southwest Design had not taken the Collins, property. The Collins' counsel deliberately thwarted this attempt to demonstrate the absence of liability on the insured's part:

"Q. BY MR. SMILAY: Now, the items that you contend were converted, you have no personal knowledge of any source as to who did the converting; correct?

"MR. HOFFMAN: Objection. It's beyond the scope.

"THE COURT: Sustained.

"MR. HOFFMAN: Also default prove-up.

"THE COURT: Sustained.

"Q. BY MR. SMILAY: And as to those items which are—which you contend have been converted, specifically what items do you contend were converted?

"MR. HOFFMAN: Objection; beyond the scope, . . .

". . . . . . . . . . . . . . . . . . . . . . . . .

"THE COURT: I'll sustain the objection."

This exchange in the record demonstrates that Mr. Smilay attempted to establish Southwest Design's innocence but that the Collins' counsel successfully thwarted his efforts because a default had been entered. It shows, in other words, that the insured's default prevented American from putting on any defense.

Despite the default and the ensuing judgment, however, the Collins have now conceded that they "do not know what happened to their property." If anything can be inferred from stipulated facts, it is that Richard Gordon removed the Collins' property and placed it in storage in a warehouse under his name. Indeed, the Collins accused Gordon in September of 1985 of removing all of their possessions to a warehouse, demanding that he return

them if he did not buy the house. Gordon responded that he had placed them in a warehouse in his name and offered to allow the Collins to inspect the warehouse. Southwest Design is not mentioned in any of the correspondence, and was first associated with the theft only in the Collins' cross-complaint in the previous litigation. Significantly, Judge Yaffe, the trial judge in this case—despite the entry of a judgment for "conversion"—also appeared to believe that Gordon converted the property. If the plaintiffs have no evidence that Southwest Design took their property, and instead argue that Richard Gordon probably took it, American plainly was prejudiced by the insured's default, which prevented it from presenting this fundamental defense.

## IV.

### DISPOSITION

That part of the judgment in favor of the Collins against American for $100,000 is reversed. The matter is remanded to the trial court to enter a new and different judgment in favor of American consistent with the views expressed herein. The cross-appeal is dismissed. Costs of appeal are awarded to appellant, American.

Lillie, P. J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I concur with the judgment, but not necessarily the full rationale, of the majority's affirmance of the trial court on the cross-appeal. I respectfully dissent, however, as to the majority's reversal of the trial court's judgment in favor of the Collins on the "conversion" cause of action.

This will be a brief dissent because the majority and I agree on much of the law. I do not read the majority opinion to hold a "conversion" cause of action can never be an "accident" for purposes of insurance coverage. Rather, I understand the majority decision to be based on a fact-specific determination—that the Collins are bound by the terms of the default judgment they obtained and this judgment specifically included the element this particular conversion involved an intent to damage, destroy and deprive the Collins of their property.

True, there is some language in the majority opinion which some might read to suggest a "conversion" is never an "accident" and, therefore, never covered under a typical accident insurance policy. However, I have too high a regard for my colleagues to believe they could accept such an absurd

notion. The tort of "conversion" is one of those which embraces a broad spectrum of conduct and mental states. At one extreme, it includes the intentional thief or even violent robber. At the other, it imposes liability on the mistaken, but not even negligent, person who in good faith and without fault ends up with someone's else's property.

" 'The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which the injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are the gist of the action.' [Citations.] [¶] It follows that *mistake, good faith, and due care* are ordinarily immaterial, and cannot be set up as defenses in an action for conversion. [Citations.]" (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 624, p. 718, italics in original.)

At and near the latter end of the spectrum, there are many "conversions" which qualify as "accidents" within any reasonable reading of any insurance coverage clause. (See, e.g., *Poggi* v. *Scott* (1914) 167 Cal. 372, 375 [139 P. 815] [defendant liable for conversion despite negligence in mistakenly believing wine barrels empty and belonged to someone other than plaintiff]; *Byer* v. *Canadian Bank of Commerce* (1937) 8 Cal.2d 297 [65 P.2d 67] [negligent misdelivery of goods by bailee to wrong person constitutes conversion]; *Swim* v. *Wilson* (1891) 90 Cal. 126 [27 P. 33] [innocent agent who sells property it turns out principal took from another is liable for conversion despite lack of knowledge or intent].)

My differences with my colleagues are over their treatment of the trial court's findings. This case was submitted on stipulated facts. The stipulated facts present a rather complete picture of what happened here. American Empire's insured, employed by the Collins' lessee, removed most of the Collins' furniture and some other possessions to a storage locker without the Collins' knowledge or consent. It did so without any intent to retain, damage or destroy that furniture or those possessions, but solely to facilitate the renovations it had been hired to perform. For whatever reason, that furniture and those possessions were damaged, destroyed, lost or stolen before American Empire's insured could return them to the Collins' possession. The Collins do not know, and as far as this case is concerned, no one, including American Empire, knows who damaged, destroyed, lost or stole the furniture and other possessions which American Empire's insured had taken and placed in storage.

Those facts constitute an *unintentional* conversion, and *accidental* conversion if you will, from the perspective of American Empire's insured. Not just

the harm but most of the acts which caused the harm were unintended and accidental in nature, just as is true in the case of the speeding automobile driver who sees his intentional act combine with other unintended causative factors to produce an "accident" which harms others.[1]

American Empire attempts to obfuscate the facts to which it stipulated by attempting to limit the facts the court can properly consider to the allegations of the Collins' complaint. If the trial court indeed were to be limited to the allegations of the Collins' complaint, American Empire should not have stipulated to the true facts of this conversion. One could be sure American Empire would have been happy to accept any deviation between the allegations of the complaint and the stipulated facts which favored its position. (Indeed, American Empire several times repeats and relies on the stipulated fact the Collins don't know what happened to their possessions after they were put in storage, a stipulated fact found nowhere in the Collins' complaint.)

American Empire cannot stipulate the facts of this conversion then deny those stipulated facts are true or can be used by the trial court to determine whether the conversion in this case was an accident for purposes of insurance coverage.

Even accepting the allegations of the complaint as somehow determinative of the nature of this "conversion" cause of action, those allegations are not nearly as unambiguous as to its insured's intent as American Empire would have us believe. Those allegations, as repeated in the majority opinion, do not accuse American Empire insured's of "intentional" conduct, but merely of "taking," etc. (In this conduct the allegation of "taking" is no more an intentional, nonaccidental act than is "speeding" an intentional, nonaccidental act in a personal injury negligence case.)

The allegations the majority opinion quotes evidencing American Empire insured's mental state are the "punitive damages" allegations of "malicious, oppressive, etc." conduct. While insurance companies are not liable for punitive damages, this does not relieve the insurer of its responsibility to indemnify its insured for the compensatory damages it must pay in that same action. In other words, the punitive damage allegations about an insured's

---

[1]American Empire cites a number of out-of-state cases for the proposition "conversion" causes of action are not "accidents" and thus are not covered by the typical insurance policy. Most, if not all, of those cases involve factual circumstances which bear no resemblance to the instant case, but situations where the conversion was obviously intentional. Even if they had precedential value these cases would be distinguishable. As out-of-state cases, they are only persuasive at best. And, in this instance, they fail to provide a persuasive reason for California to adopt an erroneous, unnecessarily broad rule.

mental state do not convert what would otherwise be an "accident" covered under the policy into "intentional conduct" not so covered. (*City Products Corp.* v. *Globe Indemnity Co.* (1979) 88 Cal.App.3d 31 [151 Cal.Rptr. 494]; 6 Witkin, *supra*, § 1330, pp. 787-788.) Accordingly, even assuming the allegations of the Collins' complaint controlled the coverage issue, the "punitive damages" allegations in this case cannot supply the mental state which turns this particular "conversion" into an intentional tort. It would remain an "accident," and thereby be covered under American Empire's insurance policy with Southwest Design.

In my opinion, the trial court was correct in concluding this conversion was an "accident" within the meaning of the "occurrence" clause of this insurance policy. This is not even a close case if one accepts the stipulated facts and what they tell us about the nature of this conversion. But even accepting American Empire's cramped version which limits the "facts" to the allegations of the Collins' complaint, this particular conversion remains an "accident" qualifying for coverage under this policy. Accordingly, I would affirm.