Filed 5/24/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| SALIMA MULTANI, | B276508 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC531587) |
| v. | |
| EVELYN KNIGHT, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court for Los Angeles County, Terry A. Green and Lawrence H. Cho, Judges. Affirmed.

Law Office of Gary Kurtz and Gary Kurtz for Plaintiff and Appellant.

Law Offices of Marc Coleman and Marc Coleman for Defendant and Respondent.

The primary question presented in this case is: Can a landlord be held liable to a commercial tenant for damage to the tenant's property resulting from an alleged sewer backup when the tenant (who had a month-to-month tenancy in the premises after her lease expired) had stopped paying rent, had been served (but failed to comply) with a three-day notice to pay rent or quit, and had been named in an unlawful detainer action filed before the alleged sewer backup occurred? We find that the month-to-month tenancy was terminated by the tenant's failure to pay rent coupled with the landlord's filing of the wrongful detainer action. Therefore, as of the filing of the wrongful detainer action, the tenant was a tenant at sufferance who had no lawful right to possession of the premises. Accordingly, the landlord is not liable for damage to the tenant's property left on the premises when that damage was not caused by the landlord's intentional act or negligence.

In this case, plaintiff Salima Multani (Salima[1]), who operated a medical clinic in a space she leased from defendant Evelyn Knight, brought claims against Knight for conversion, breach of the covenant of quiet enjoyment, nuisance, negligent maintenance of property and/or strict liability (negligence/strict liability), negligent interference with contract relations (contract interference), and violations of Business and Professions Code section 17200 (section 17200). The trial court granted Knight's motion for summary adjudication as to all of the claims except

---

[1] Because we will be referring to Salima's two sons, Rahim and Khaleel, who share Salima's last name, we will refer to each of them by their first names. We do so for clarity, and mean no disrespect.

2

the contract interference claim, finding that Salima was not lawfully on the premises when the alleged sewage spill occurred. The contract interference claim went to trial before a jury, and the jury found in favor of Knight, finding that the alleged contractual or economic relationship did not exist.

On appeal, Salima contends the trial court erred by granting summary adjudication because a tenant who does not pay rent retains all legal rights of possession up until the time she is dispossessed following the successful conclusion of an unlawful detainer action. She also contends the jury's verdict was not supported by substantial evidence. Neither contention has merit. Accordingly, we affirm the judgment.

## BACKGROUND

A. *Facts Leading to the Lawsuit*

The following facts are, for the most part, undisputed.[2]

Knight owned commercial property located in Long Beach, California (the premises). She entered into a five-year lease for the premises with Salima in 1993, with rent due on or before the first of every month. Salima, who was a physician, ran a medical clinic on the premises. In 1998, Knight and Salima entered into a second five-year

---

[2]     Salima purported to dispute some of the facts, but the trial court found that either she failed to submit any admissible evidence to establish a dispute, or the evidence submitted contradicted Salima's deposition testimony and therefore the court rejected it. Salima does not challenge the trial court's evidentiary rulings on appeal.

lease. After that lease expired in 2003, Salima continued to pay the agreed-upon rent on or before the first day of every month, and Knight accepted those payments; thus by law, Salima had a month-to-month tenancy beginning in 2003 under the same terms as the expired lease.

In or before May 2011, Dr. Boniface Onubah heard from Salima's son Rahim that Salima was winding down her medical practice, and he asked about the future of the clinic. He was told that the clinic, including its health contracts and equipment, would be available for purchase. On May 26, 2011, Onubah purportedly entered into a written agreement with Salima to purchase the clinic for $400,000.[3] The sale was supposed to close in January 2012, but it did not go through.

In July 2011, Salima was experiencing knee problems and stopped working at the clinic.[4] She failed to pay rent for July 2011, and paid no rent thereafter. In early December 2011, Knight caused a three-day notice to pay rent or quit to be conspicuously posted on the premises, with a copy mailed to Salima. Salima did not respond to the notice.

---

[3]    Although there is a written agreement purportedly signed by Salima (which signature was notarized), Salima testified at her deposition that she never attempted to sell her medical practice and she did not remember entering into a contract to sell her clinic. Her son Khaleel testified at trial that he and his brother Rahim made all business decisions regarding the clinic, and that he did not think that she knew that she was selling the clinic to Onubah.

[4]    Although Salima stopped working at the clinic, whether the clinic remained open is disputed. Rahim, Khaleel, and their sister Afshan testified that the clinic, staffed by other physicians, remained open through December 2011. Salima testified at her deposition, however, that the clinic closed when she stopped working, and Knight presented evidence that the clinic appeared to have been unoccupied for some time as of early December 2011.

On December 9, 2011, Knight filed an unlawful detainer action against Salima. Salima defaulted, and judgment was entered in favor of Knight. Knight obtained a writ of possession, and Salima was evicted from the premises on May 17, 2012.

In the meantime, according to Rahim and Khaleel, sometime between late December 2011 and January 6, 2012, the sewer line for the premises had backed up, causing raw sewage to flow from all of the sinks, contaminating all of the medical equipment, supplies, and patient files for the clinic, rendering them unusable. As a result, the sale to Onubah could not be completed.

B.    *The Present Lawsuit*

A year and a half after she was evicted, Salima filed the instant lawsuit against Knight, alleging claims for conversion, breach of the covenant of quiet enjoyment, nuisance, negligence/strict liability, contract interference, and violations of section 17200. In the complaint, Salima is named as "an individual d/b/a FAMILY HEALTH SERVICES MEDICAL CLINIC."

Knight filed a cross-complaint against Salima seeking the rent Salima failed to pay from July 2011 until she was evicted. Knight also alleged claims for nuisance and negligence based upon water damage to the premises that occurred while Salima was in sole possession of the premises.[5]

---

[5]    The parties ultimately entered into a stipulation regarding the cross-complaint. Because no issues are raised on appeal regarding the cross-complaint, we will not address it further in this opinion.

1. *The Motion for Summary Judgment/Adjudication*

    a. *Knight's Motion*

Knight filed a motion for summary judgment or summary adjudication of each of Salima's claims. She argued that Salima could not prevail on any of her claims because she was unlawfully on the premises at all times after July 1, 2011, and was illegally on the premises after December 9, 2011. She also argued that (1) the conversion claim failed because Salima abandoned and did not try to recover her property left on the premises; (2) the breach of the covenant of quiet enjoyment failed because Salima's occupancy of the premises was illegal after December 9, 2011, and because this claim did not exist for commercial property as a matter of law; (3) the nuisance claim failed because Salima's occupancy of the premises was illegal and there was no evidence of a legally sufficient nuisance; (4) the negligence/strict liability claim failed because Salima's occupancy of the premises was illegal, there was no strict liability as a matter of law, and Knight was not negligent; (5) the contract interference claim failed because Salima did not have a contract to sell her business, but even if she did, Knight was unaware of it and did nothing to harm any alleged relationship, and Salima sustained no damages; and (6) the section 17200 claim failed because all the underlying claims failed, there was no business practice within the meaning of that statute, and Salima sustained no actual injury.

In support of her motion, Knight submitted, among other things, her own declaration, the declaration of a maintenance man who maintained Knight's commercial real estate, including the premises, and excerpts from Salima's deposition.

In her own declaration, Knight described the history of Salima's tenancy and rental payments (or lack thereof), her service of the three-day notice to pay rent or quit, and the wrongful detainer action. She also stated that at no time during Salima's possession of the premises did Salima or anyone on her behalf inform Knight that there were any problems with the plumbing or with sewage on the premises, and she was not aware of any such problems other than one incident in March 2012. With regard to that incident, she explained that she was contacted by neighbors of the premises, who told her that the Long Beach Hazmat team had been called to the premises to investigate water damage. She contacted her maintenance man, Salvador Ornelas, and asked him to go to the premises to see what had happened. Ornelas reported back to her that all of the sinks except one were clogged and filled with water; he said the faucets had been left on, causing the sinks to overflow onto the floors and carpets and out the front door. He also reported that there were no sewage problems, and that the two bathrooms on the premises were working fine. Knight also declared that Salima had changed the locks, and she (Knight) did not have a key; therefore, the only people who had access to the premises at the time of the incident were Salima and anyone to whom she entrusted a key. Finally, Knight declared that all of Salima's medical and office equipment on the premises were intact and undamaged, that neither

7

Salima nor anyone on her behalf ever responded to Knight's several attempts to contact Salima to ask her to remove the property, and that no one ever informed her (and she was not aware) that Salima was attempting to enter into or had entered into a contract to sell Salima's medical practice.[6]

In his declaration, Ornelas also described the March 2012 incident. He stated that he went to the premises at Knight's request. When he arrived, neither Salima nor anyone from the clinic was there. He had to cut the locks on the security gates to gain access because neither he nor Knight had a key. He went through all of the rooms on the premises, and found that all of the sinks except one were clogged with dirty water. He observed that water had come from the faucets into the sinks, and the sinks had overflowed onto the floors and carpet and out the front door. It appeared to him that the dirty water and dirty carpet had been there for some time, which caused a stench inside. He did not observe any sewage damage or leak of any kind, and noted that none of the medical equipment or furniture on the premises was damaged by the water leak. Finally, Ornelas stated that at no time from 2010 to March 2012 was he made aware of any plumbing issues at the premises.

---

[6] Knight attached as an exhibit to her declaration a Hazmat report dated March 1, 2012. The report described the incident as follows: "Vacant building with clogged plumbing; possibly from vandalism. Water damage to floors and carpets. Plumber dumped 0.5 gallons residual stagnant water in alley from snaking drains. Neighbor called regarding smell. E-7 covered liquid with absorbent to reduce smell. No public health hazard. Building owner on scene [E. Knight]. Adv to dump no more residue or debris outside."

8

The excerpts of Salima's deposition testimony submitted in support of Knight's motion included her testimony that (1) she stopped working after undergoing knee surgery in July 2011; (2) she stopped paying rent in July 2011; (3) she was the only doctor who worked at the clinic, so the clinic closed when she stopped working; (4) she was renting the premises on a month-to-month basis; (5) she did nothing to retrieve her property from the premises after the clinic closed in July 2011, even though she had opportunities to do so; and (6) she did not attempt to sell her medical practice, and did not remember entering into a contract to sell the clinic.

b. *Salima's Opposition*

In opposition to Knight's motion, Salima argued that she was lawfully in possession of the premises, and retained all legal rights of possession up to the time she was dispossessed following the completion of the unlawful detainer process. With regard to the conversion claim, Salima argued that Knight's defense that Salima had abandoned her property was legally deficient because her claim was based upon environmental contamination, and that the act of conversion was completed when her medical equipment and supplies were contaminated as a result of the raw sewage spill. She also argued that the abandonment defense was factually deficient because Knight failed to show that she complied with statutory notice requirements that apply when premises are vacated. With regard to the breach of the covenant of quiet enjoyment claim, Salima agreed with Knight's assertion that this kind of claim does not apply to commercial

9

properties, but argued that the allegations of the claim adequately pleaded a claim for constructive eviction; she asked the court to ignore the label of the claim and treat it as a claim for constructive eviction. Addressing the nuisance claim, Salima argued that Knight's illegality argument was baseless, and that there were disputed factual issues raised by Rahim's testimony. Salima argued that the negligence/strict liability claim could not be resolved on summary judgment because there was evidence that Knight was given notice of plumbing problems in the past, and was given notice of the sewage issue immediately after it occurred. With regard to the contract interference claim, Salima argued there were factual disputes regarding Knight's knowledge of the sale and the fact of the sale; she noted there was a signed contract for the sale, and that her deposition testimony that she did not sell her practice was of "no moment" because she was not involved in the business end of the practice. Finally, Salima argued there were no grounds to grant summary adjudication of the section 17200 claim because it is based upon her other claims, all of which should survive summary adjudication.

In support of her opposition, Salima submitted declarations from Khaleel, Rahim, Onubah, and expert witness Dr. Marvin Pietruszka. In addition, Salima submitted a copy of an asset purchase agreement between Salima and Onubah for the sale of the clinic, as well as

10

undated photographs of the premises, purportedly showing the damage caused by the alleged sewage spill.[7]

Khaleel stated in his declaration that he was the administrator and manager for Family Health Services Medical Clinic from 1993 through 2012, with primary responsibility for the business aspects of the clinic; his brother Rahim assisted him. He declared that he did not regularly consult his mother regarding business aspects of the clinic, particularly toward the end of the clinic's operation, and therefore there were many business matters that took place of which she was not aware. He stated that there were physicians in addition to Salima who were employed by the clinic between 2007 and 2011, including Dr. Onubah. He also stated that in 2011, Salima entered into a contract (a copy of which was attached to his declaration) to sell the clinic to Onubah; Onubah agreed to purchase every item in the office, including the medical equipment and devices, office furniture and equipment, and patient files. Although Khaleel's declaration included a discussion about the alleged sewage backup incident, Knight's objections to that discussion were sustained, except for Khaleel's statement that after he and Rahim discovered the alleged sewage backup they attempted to contact Knight and left messages for her, telling her about the condition of the property.

---

[7]     The record on appeal does not include the original photographs; instead, it includes black-and-white photocopies of photographs. Because of the poor quality of the photocopies, one cannot tell by looking at them whether there was any damage to the equipment or furniture. We do not know whether the original photographs or photocopies were before the trial court. This does not, however, affect our review of the issues on appeal.

11

Rahim stated in his declaration that he negotiated the original lease for the premises in 1993, and arranged (along with Salima) to purchase the office furniture and equipment, the medical equipment, and the medical supplies. He noted that over the years, Salima's medical practice became very successful, and she hired additional physicians and medical staff, and upgraded the clinic's equipment. By 2011, the clinic had approximately 4,000 active patients and the latest advanced technological medical equipment. Rahim declared that he arranged for Onubah to purchase the practice. He stated that he spoke to Knight, explained that Salima would be winding down her treatment of patients, and that he had arranged for Onubah to take over the practice, although it would take Onubah between three to six months to get the accreditation in various health plans and staff privileges in nearby hospitals that were necessary for him to take over the practice. Rahim stated that Knight agreed to assign the lease for the premises to a new tenant physician, and that Onubah's ownership was to be complete by January 2012.

Rahim declared that Salima and her staff closed the clinic for the New Year's holiday in December 2011 and reopened it on January 6, 2012. When they went to reopen it, he and Khaleel discovered that "raw human sewage exploded from each of the sinks of the clinic spilling sewage onto and over everything in the clinic," and that the medical equipment, supplies, drug samples, and patient files were all contaminated with sewage and permanently ruined. He stated that he and Khaleel both tried to contact Knight, and left detailed messages on her voicemail describing the condition of the premises, but she ignored

12

their requests to address the situation. He declared that as a result of the sewage spill, the sale of the practice to Onubah could not be completed, and Salima lost the $400,000 purchase price. Finally, Rahim declared that the December 2011/January 2012 incident was not the first plumbing problem at the premises. He stated that in 2009, water backed up from a drain in one of the sinks and filled the sink with foul-smelling water, which, Rahim declared, "suggested a problem with the main line of the building." He noted that Knight promptly remediated the problem (although not with a licensed plumber) but did not address the "more systemic problem."[8]

Onubah stated in his declaration that he worked at Family Health Services Medical Clinic at various times from 2008 through 2011. When he heard from Rahim that Salima was winding down her practice of medicine, he asked about the future of the clinic and was told that it would be available for purchase. He stated that on or about May 26, 2011, he entered into an agreement to purchase the clinic for $400,000, which included everything in the clinic; he understood that a new lease would be generated for the premises. He declared that the sale was scheduled to close in January 2012, and that in the meantime he began the process of becoming a provider for all of the health plans, HMOs, and PPOs for which Salima was a provider, and obtained staff privileges at a nearby hospital.

---

[8]    Rahim stated that portions of his deposition testimony were attached as an exhibit to his complaint, but no such testimony was attached to the declaration filed with the trial court, and it is not included in the record on appeal.

Expert witness Pietruszka declared that he was a physician with board certification in anatomic pathology, clinical pathology, occupational medicine, and forensic toxicology. He stated that he reviewed the photographs and other materials, including unidentified declarations, and a "Hazmat report concerning this incident."[9] Based upon that review, he opined that the alleged sewage spill and the failure to remediate it immediately resulted in a serious health risk.

### c. *The Trial Court's Ruling*

At the hearing on the summary adjudication motion, the trial court (Hon. Terry A. Green, presiding) ruled on Knight's objections to Salima's evidence and, in light of those rulings found that many of the facts listed in Knight's separate statement of undisputed facts were, in fact, undisputed. Based upon the undisputed facts that Salima did not pay rent after June 2011, was served with a three-day notice to pay rent or quit, and failed to respond to the notice, the trial court found that Salima was illegally in possession of the premises after December 9, 2011 (when the unlawful detainer action was filed). The court then addressed each of the causes of action.

As to the conversion claim, the court observed that Salima had the only keys to the premises and admitted she could have gone there to

---

[9] It is unclear which "incident" Pietruszka references. According to Rahim, the alleged sewage spill occurred sometime between late December 2011 and January 6, 2012. The only Hazmat report in the record is from March 2012, and describes the incident as involving only water damage, with no public health hazard.

14

retrieve her property at any time between June 2011 and May 2012. Although the court noted there was a dispute regarding whether all the medical equipment and furnishings were destroyed by sewage, it concluded that Salima abandoned her property and therefore could not establish a conversion claim.

With regard to the breach of the covenant of quiet enjoyment claim, the court agreed with the parties that it does not apply to a commercial lease. The court declined to treat the claim as one for constructive eviction for two reasons: first, there was no lease; and second, by December 2011 or January 2012, Salima was not lawfully on the premises.

Although the court found that Salima raised a disputed issue as to whether there was a sewage spill (as opposed to a water spill), it concluded she could not establish a nuisance claim for two reasons. First, the court found that Salima could not establish that she was lawfully in possession of the premises at the time of the incident. Second, the court found there was no evidence that Knight knew or should have known that a sewer backup was likely; the court found that the evidence that there had been a clogged drain many years before was insufficient to establish that fact.

The court did not address the negligence/strict liability claim other than to state that it "think[s] you agree that summary adjudication should be granted on that."

The court granted summary adjudication of the section 17200 claim on the ground there was no evidence of fraud or unlawful behavior.

15

Finally, the court found there were factual issues precluding summary adjudication of the contract interference claim. Therefore, the court denied summary judgment, but granted summary adjudication on all claims except the contract interference claim.

2. *The Trial*

A jury trial on the contract interference claim was held before a different trial judge (Hon. Lawrence H. Cho). Our discussion of the evidence presented at trial is limited to evidence related to the issue on appeal, i.e., whether there was substantial evidence to support the jury's finding that no economic relationship existed between Salima and Onubah.

Salima did not testify at trial. Instead, the only evidence of the existence of an economic relationship between Salima and Onubah was the written contract dated May 26, 2011 that Salima and Onubah purportedly signed, and the testimony of Rahim, Onubah, and Khaleel.

Rahim testified that he, Khaleel, and their father "were controlling the business or operating the business." He explained that as Salima's health got worse in 2011 "a decision was made to find a buyer" for the clinic. He knew a doctor—Onubah—who had expressed an interest in acquiring the practice, and he brokered a deal with Onubah that resulted in a written agreement to sell the practice to him. Salima was not present when Onubah signed the agreement, although Rahim testified that Salima met with Onubah several times in 2011 and discussed her patients, her retirement, and the sale of her practice.

16

Rahim also testified about entering the clinic on January 6, 2012 and discovering the alleged sewage spill. He had a meeting scheduled with Onubah the next day, but after discovering the spill he cancelled it; he did not tell Onubah the reason. Rahim determined the sale could not go forward because all of the medical equipment was contaminated and could not be used in the care and treatment of patients. He did not tell Onubah, however, and Onubah continued to follow up, wanting to finalize and consummate the deal; Rahim kept giving him excuses for not being able to meet with him. The deal never closed, and he later learned that Onubah entered into an arrangement with another medical office.

Following his testimony, the court asked Rahim several questions that had been submitted by jurors,[10] including one about whether he informed Salima that the family had a signed contract for the sale of her practice to Onubah. Rahim answered that he did.

Onubah testified that while he was seeing patients for Salima after her health problems prevented her from working as often as she had, he spoke to Rahim and/or Khaleel about them having to transfer or sell the clinic. He told them that he was interested in the practice, and they reached an agreement for him to buy it. They entered into a written agreement; only Rahim was present when he signed it.

---

[10]    The trial court allowed the jurors to submit questions for each witness, which the court read at the end of the witness's testimony (unless the question sought inadmissible evidence). The court also allowed the jurors to directly ask follow-up questions if their questions were asked but not adequately answered.

Onubah testified that his primary interest in buying the practice was the patient population. The equipment was important because it is necessary to serve the patients, but the precise location of the clinic was not, as long as the location was not too far from the present location of the clinic. He testified that it would have been worth it to him to pay $400,000 for the clinic even if he had to buy all new equipment. He stated that he would not have backed out of the contract if Rahim had told him about the damage to the clinic; he said that he would have asked to renegotiate the amount, "but if they insisted, I will still pay for it."

Khaleel testified on direct examination that Salima was not involved in the decision about what would be done with the clinic upon her retirement, and that she did not participate in any way with the sale of the clinic to Onubah. In fact, he did not even tell her about it. On cross-examination, Khaleel was asked, "Is it correct to say that your mother Salima Multani did not ever know that she was selling her practice to Boniface Onubah?" He responded, "We made all the business decisions on her behalf." When asked whether Salima ever knew that she was selling her practice to Onubah, Khaleel stated that as far as he knew, he did not think she knew, but "Rahim may have told her in passing." Following his testimony, the court asked him several questions from jurors, including the following: "Did you or Rahim then or now have your mother's legal power of attorney?" Khaleel responded that Rahim had legal power of attorney. The juror followed up, asking, "As of what date?" The reporter's transcript does not indicate Khaleel's

18

response.  The trial court then asked, "You're not sure?"  Khaleel responded, "He has the power of attorney."

After the case was sent to the jury, the jury submitted two more questions.  The first asked, "From what date to what date did Rahim Multani have power of attorney over Salima Multani?  Additionally, what areas did the power of attorney cover?"  The second question asked for a read back of testimony from Rahim and Khaleel regarding whether Salima knew or was informed of the contract with Onubah or of the sale in general.  In response to the first question, the court (after consultation with counsel) told the jury:  "We have located the only reference to power of attorney in the trial transcript and will have the reporter read you that one and only passage.  No power of attorney has been admitted into evidence."  In response to the second question, the court told the jury:  "We have found no reference available in Rahim's testimony."

Shortly thereafter, the jury reached its verdict in favor of Knight, answering "No" to the first question on the special verdict form, which read:  "Were Salima Multani and Boniface Onubah in an economic relationship including without limitation a contract that probably would have resulted in a future economic benefit to Salima Multani?"

The trial court entered judgment in favor of Knight, from which Salima now appeals.

19

## DISCUSSION

A.  *Rights of a Non-Rent-Paying Month-to-Month Tenant*

The most significant issue in this case centers on what rights Salima possessed vis à vis the premises at the time of the alleged sewage spill.  Although the trial court's finding on this issue was not entirely dispositive of all its summary adjudication rulings, it was an important factor in all of them.

Knight argues, and the trial court agreed, that Salima became a tenant at sufferance no later than when Knight filed the unlawful detainer action against her; therefore, she had only the right of "naked possession," i.e., the right not to be forcibly evicted without legal process.  Salima argues that despite her nonpayment of rent, she retained all legal rights as a month-to-month tenant until she was dispossessed following the conclusion of the unlawful detainer action.

None of the cases either party cites in support of her argument addresses the precise issue presented here:  the rights of a month-to-month tenant (and the obligations owed to the tenant by the landlord) after she has stopped paying rent and the landlord has initiated an unlawful detainer action.  Our research has not uncovered any such cases.  But applying basic landlord-tenant and contract principles, we conclude that Knight has the better argument.

In this case Salima started out as a tenant under a written lease.  When, after Salima's second lease expired, she continued to pay rent and Knight accepted those payments, her tenancy became a month-to-month tenancy under the same terms as the expired lease.  (Civ. Code, § 1945 ["If a lessee of real property remains in possession thereof after

20

the expiration of the hiring, and the lessor accepts rent from him, the parties are presumed to have renewed the hiring on the same terms and for the same time, not exceeding one month when the rent is payable monthly, nor in any case one year"].)  Thus, during that tenancy, Salima retained all the rights as a tenant that she possessed under the written lease.

Ordinarily, a month-to-month tenancy is terminated only upon the giving of 30 days notice.  (Civ. Code, § 1946.)  In this case, neither party gave the other a specific notice of termination.  However, Salima gave an implied (albeit untimely) notice by failing to pay rent in July 2011 and for several months after.  Put another way, because Salima failed to tender rent, Knight could not accept it, and therefore the statutory presumption that the parties "have renewed the hiring on the same terms" (Civ. Code, § 1945) no longer applied.  Thus, the implied month-to-month lease terminated when Salima failed to pay rent.

Further, even if Salima's failure to pay rent, in itself, did not terminate the statutorily-implied lease, it nevertheless constituted a material breach of the lease.  And, when one party to a contract breaches a material term of the contract, the other party has the option to terminate the contract for cause.  (See, e.g., *B. L. Metcalf General Contractor, Inc. v. Earl Erne, Inc.* (1963) 212 Cal.App.2d 689, 693; see also *Wood, Curtis & Co. v. Scurich* (1907) 5 Cal.App. 252, 254 ["the refusal of one party to a contract to make payment as called for by the terms of a contract excuses the other party from further performance on his part"].)  Here, Knight's service of a three-day notice to pay rent or quit and her initiation of an unlawful detainer action when Salima

21

failed to comply with the notice indisputably establishes Knight's election to terminate the implied lease. Thus, even if Salima's initial failure to pay rent did not terminate her month-to-month tenancy, her failure to comply with the three-day notice to pay rent or quit, followed by Knight's filing of an unlawful detainer action, terminated the implied lease and Salima's legal right to possession of the premises.

In short, contrary to Salima's assertion that she retained all the rights of a month-to-month tenant until the conclusion of the unlawful detainer action, the trial court correctly found that by remaining in possession of the premises without Knight's consent after termination of her month-to-month tenancy (which occurred no later than when Knight *initiated* the unlawful detainer action after Salima failed to comply with the three-day notice to pay rent or quit), Salima became a holdover tenant or tenant at sufferance. Thus, at the time of the events at issue in the lawsuit, she had no contractual relationship with Knight, and "ha[d] but "'naked possession'"" of the premises. (*Aviel v. Ng* (2008) 161 Cal.App.4th 809, 820.)

B.   *The Trial Court Properly Granted Summary Adjudication*

Having concluded that the trial court correctly reasoned that Salima's possession of the premises was unlawful at the time of the alleged sewage spill, we now address Salima's additional arguments specifically challenging the trial court's summary adjudication of her

22

conversion, breach of the covenant of quiet enjoyment, nuisance, and negligence/strict liability claims.[11]

### 1. *Conversion*

"The tort of conversion is an 'act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.'" (*Collin v. American Empire Ins. Co.* (1994) 21 Cal.App.4th 787, 812.) In this case, as noted, the trial court found that Knight was entitled to summary adjudication of the conversion claim because the undisputed evidence—Salima's deposition testimony that she had the only keys to the premises and she could have gone to retrieve her property at any time—established that Salima abandoned her property. Salima challenges that ruling, contending that "the act of conversion was completed when the environmental contaminant [i.e., the alleged sewage spill] destroyed [Salima's] expensive medical equipment and supplies," and therefore there was nothing left for Salima to recover.

We begin our discussion by noting that the basis for Salima's conversion claim changed from the complaint to the summary adjudication motion. In her complaint, she alleged a generic conversion claim—i.e., that Knight wrongfully took possession of Salima's property. The allegations of the claim did not mention environmental contamination. At the hearing on the motion for summary adjudication,

---

[11] Salima does not challenge the ruling granting summary adjudication of her section 17200 claim.

however, Salima's counsel stated: "[T]he conversion that's defended in the summary judgment motion is a particular and unusual kind of conversion, conversion caused by an environmental contaminant. It's not like the landlord went in and took the property. *We're not claiming conversion based on a post-lockout failure to inventory and return the items after the unlawful detainer.*" (Italics added.)

In light of counsel's statement, which expressly waived any claim for conversion based upon Knight's alleged retention of the property, we confine our discussion to the propriety of summary adjudication of the conversion claim based upon environmental contamination.[12] We conclude that even if Salima is correct that there was no abandonment because the alleged conversion took place at the time of the purported

---

[12] We note that Salima included a passing reference in her appellant's opening brief that seems to suggest that she *is*, in fact, also relying upon Knight's alleged retention of the property. After arguing that the conversion occurred at the time of the sewage spill, which so contaminated the property that "there was nothing [for Salima] to attempt to recover," Salima states: "Finally, [Knight's] abandonment [defense] was insufficient because she has failed to evidence compliance with the notice requirements of Civil Code § 1993.03. Accordingly, [Knight] would have liability for conversion based on failing to comply with this statutory notice requirement even after she regained possession of [the premises]." Although Salima provided a more complete argument in her appellant's reply brief, the above-quoted two sentences are the entirety of the discussion of this issue in the appellant's opening brief. That is insufficient to preserve the issue for review. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["It is the responsibility of the appellant, here plaintiffs, to support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. [Citations.] In addition, citing cases [or statutes] without any discussion of their application to the present case results in forfeiture"].)

24

sewage spill (although we make no such finding), we nevertheless find that the trial court properly granted summary adjudication because the undisputed facts establish there was no conversion under Salima's environmental contamination theory. (See *California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22 ["'the appellate court may affirm a summary judgment on any correct legal theory, as long as the parties had an adequate opportunity to address the theory in the trial court'"].)

Conversion is an intentional tort. (*Collin v. American Empire Ins. Co.*, *supra*, 21 Cal.App.4th at p. 812.) "The *act* [constituting conversion] must be knowingly or intentionally done, but a *wrongful intent* is not necessary. [Citations.] Because the act must be knowingly done, 'neither negligence, active or passive, nor a breach of contract, even though it result in injury to, or loss of, specific property, constitutes a conversion.'" (*Taylor v. Forte Hotels International* (1991) 235 Cal.App.3d 1119, 1124.) As the Supreme Court explained in finding no conversion in a case in which the plaintiff's household furnishings and effects were destroyed in a fire while in the possession of the defendant, if return of the property to the plaintiff is impossible "because the goods have been lost or destroyed, either without fault on the part of the bailee or merely because of his negligence, there is no conversion. Negligence in caring for the goods is not an act of dominion over them such as is necessary to make the bailee liable as a converter." (*George v. Bekins Van & Storage Co.* (1949) 33 Cal.2d 834, 838.)

In this case, there was no evidence presented at the summary adjudication stage to indicate that Knight caused the alleged sewage spill. In fact, as discussed in section B.4., *post*, the evidence presented at the summary adjudication stage was undisputed that Knight was not negligent in failing to prevent the spill. Accordingly, she cannot be held liable for conversion based upon the alleged environmental contamination, and summary adjudication was properly granted.

2. *Breach of the Covenant of Quiet Enjoyment*

In her appellant's opening brief, Salima concedes that the trial court correctly accepted Knight's argument that there can be no claim for breach of the covenant of quiet enjoyment in commercial tenancies, but she argues the trial court erred by granting summary adjudication because her complaint alleged, and she presented evidence to support, a constructive eviction claim. Although we note that her concession was misguided—every lease, including a commercial lease, includes an implied covenant of quiet enjoyment, although the covenant may be waived in commercial leases (Civ. Code, § 1927; *Avalon Pacific-Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1191; *Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 512-513)—we conclude the trial court's grant of summary adjudication nevertheless was proper.

The trial court's error in finding that breach of the covenant of quiet enjoyment did not apply to commercial leases does not affect the correctness of its grant of summary adjudication because the breach that Salima asserted was that she was constructively evicted (see

26

*Erlach v. Sierra Asset Servicing, LLC* (2014) 226 Cal.App.4th 1281, 1299 [the covenant of quiet enjoyment "is breached upon actual or constructive eviction of the tenant"]), and the trial court properly rejected that assertion.

The covenant of quiet enjoyment, as codified in Civil Code section 1927, arises from a lease: "An agreement to let upon hire binds the letter to secure to the hirer the quiet possession of the thing hired during the term of the hiring." (Civ. Code, § 1927.) "Under this section, there is an implied covenant on the part of a landlord that a tenant shall have quiet enjoyment and possession of the premises *during the continuation of the term*." (*Lee v. Placer Title Co.*, *supra*, 28 Cal.App.4th at p. 512, italics added.) In this case, the trial court found—based upon the undisputed facts that Salima stopped paying rent and failed to comply with Knight's three-day notice to pay rent or quit—that at the time of the alleged constructive eviction (i.e., when the purported sewage spill occurred in January 2012) there was no lease, and Salima was not lawfully in possession of the premises. As discussed in section A., *ante*, these findings were correct in light of the undisputed facts before the court. Therefore, the court properly granted summary adjudication in favor of Knight on Salima's breach of the covenant of quiet enjoyment claim.

3.    *Nuisance*

Salima alleged that the sewage spill constituted a nuisance, which is defined by statute as "[a]nything which is injurious to health . . . or is indecent or offensive to the senses . . . so as to interfere with the

comfortable enjoyment of life or property." (Civ. Code, § 3479.) She contends the trial court erred in granting summary adjudication of her claim because she presented evidence that the sewage spill constituted a nuisance, and none of Knight's defenses—including her defense that Salima's occupation of the premises was illegal—has any application. She is incorrect.

Section 731 of the Code of Civil Procedure governs who may bring an action for nuisance. It provides: "An action may be brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor." (Code Civ. Proc., § 731.) It is long established that "an action based upon a private nuisance as that the term is known to the law may be maintained only by those whose property rights have been invaded; that while a [lawful] possessor of land is allowed to recover incidental damages for harms to his person or chattels in an action for private nuisance, the action is not available for the protection of those interests to a person who has no property rights or privileges in land." (*Neuber v. Royal Realty Co.* (1948) 86 Cal.App.2d 596, 624, overruled in part by *Porter v. Montgomery Ward & Co., Inc.* (1957) 48 Cal.2d 846.)

In this case, the trial court found, based upon undisputed evidence, that Salima was not lawfully in possession of the premises when the alleged sewage spill occurred. As discussed in section A., *ante*, that finding was correct. Therefore, Salima did not have standing

28

to bring a nuisance claim, and the court's summary adjudication of that claim in favor of Knight was proper.

4.    *Negligence/Strict Liability*

Salima contends the trial court erred in granting summary adjudication of her negligence/strict liability claim because there was a disputed issue of fact regarding whether Knight knew or should have known there were plumbing issues causing sewage to back up. We disagree.

In her appellant's opening brief, Salima states that "[t]hroughout the terms of [Salima's] tenancy of 18 years, there were several problems with plumbing issues, all of which resulted in [Knight] arranging inspections and some type of inadequate repairs by her brother and/or an unlicensed handyman." While it is true that there was evidence presented *at trial* of multiple plumbing issues over the years, as the trial court pointed out in ruling on the summary adjudication motion, the only evidence before it on that motion regarding prior plumbing issues was evidence of an incident in 2009 involving a backed-up drain in a single sink, which filled the sink with foul-smelling water, and which Knight promptly remediated. The court found that this single incident was not sufficient to show that Knight knew or had reason to know there was a significant plumbing problem that would result in a major sewage back-up three years later, and therefore Knight was not negligent in failing to repair it before the alleged spill. We agree with the trial court's assessment. (See, e.g., *Mora v. Bakers Commodities, Inc.* (1989) 210 Cal.App.3d 771, 782 ["The landlord's obligation is only to

do what is reasonable under the circumstances. The landlord need not take extraordinary measures or make unreasonable expenditures of time and money in trying to discover hazards unless the circumstances so warrant"].) Accordingly, we conclude the court properly granted summary adjudication of the negligence/strict liability claim.

C. *Substantial Evidence Supports the Jury's Verdict on the Contract Interference Claim*

As noted, the jury in the trial of Salima's contract interference claim reached a verdict in favor of Knight, finding there was no economic relationship between Salima and Onubah. On appeal, Salima argues that the verdict was not supported by substantial evidence because there was such overwhelming evidence of a sales agreement between Salima and Onubah that no rational trier of fact could conclude there was no economic relationship between them that contained a reasonably probable future economic benefit or advantage.

"[W]hen the 'findings of fact are challenged in a civil appeal, we are bound by the familiar principle that "the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.]' [Citation.] 'In applying this standard of review, we "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . ." [Citation.]' [Citation.] '"Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' [Citation.] We

do not reweigh evidence or reassess the credibility of witnesses. [Citation.] We are 'not a second trier of fact.' [Citation.] A party 'raising a claim of insufficiency of the evidence assumes a "daunting burden." [Citation.]' [Citation.]" (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245-1246.)

Salima did not meet her burden here. In her opening brief, she sets forth the evidence presented at trial to show there was an economic relationship: the written contract; Rahim's testimony about finding a buyer for Salima's practice and contracting with Onubah; Onubah's testimony confirming the agreement; and Khaleel's testimony that the practice was sold.

What Salima does *not* acknowledge in her briefs on appeal is the evidence, and reasonable inferences that could be drawn from the evidence, that Salima was unaware of the alleged sale. Although Rahim testified that Salima discussed the sale with Onubah and knew there was a signed agreement, Onubah testified that he spoke only with Rahim and/or Khaleel about the sale. More important, Khaleel testified that Salima was not involved in the decision to sell the clinic to Onubah, that he never told her about it, and that at most, Rahim "may have told her in passing."

Khaleel explained Salima's lack of knowledge of the agreement Rahim negotiated by stating that he and Rahim "made all the business decisions on her behalf." But the facts that Rahim and Khaleel took care of business matters for Salima, and that Rahim reached an agreement to sell the clinic to Onubah do not assist Salima here. The cause of action was brought by Salima, as *an individual* doing business

31

as Family Health Services Medical Clinic.  The business was not a legal entity separate from Salima as an individual.  (See *Providence Washington Ins. Co. v. Valley Forge Ins. Co.* (1996) 42 Cal.App.4th 1194, 1200 ["'The designation "d/b/a" means "doing business as" but is merely descriptive of the person or corporation who does business under some other name.  Doing business under another name does not create an entity distinct from the person operating the business.' [Citation.]  The business name is a fiction, and so too is any implication that the business is a legal entity separate from its owner"].)  That Rahim may have told Salima about the sale does not show that *she* reached an agreement to sell.  Unless Rahim had Salima's personal power of attorney to act on her behalf in selling her practice or the clinic, evidence of *his* agreement with Onubah is irrelevant.  Indeed, the jury apparently recognized this issue and sought evidence of such a power of attorney, first asking Khaleel whether one existed, and then asking during deliberations for additional information about it (information that had not been presented, and therefore was unavailable to the jury).

In light of Onubah's testimony that he spoke only to Rahim and Khaleel about the sale, and Khaleel's testimony that Salima did not participate in the decision to sell the clinic, the jurors reasonably could have viewed the written contract before them with skepticism, either believing that she did not sign it herself (despite the notarization), or that she signed it but did not know what it was that she was signing (and therefore she herself did not reach any agreement with Onubah).  In short, we find that substantial evidence supports the jury's verdict.

## DISPOSITION

The judgment is affirmed. Knight shall recover her costs on appeal.

**CERTIFIED FOR PUBLICATION**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.

COLLINS, J.